UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

CHAD LEDET                              CIVIL ACTION

VERSUS                                  NO: 10-1713

SMITH MARINE TOWING                     SECTION: R(4)
CORPORATION

<u>**ORDER AND REASONS**</u>

The Court conducted a two-day bench trial on plaintiff Chad Ledet's claims of negligence under the Jones Act, 46 U.S.C. § 30104(a), and unseaworthiness under the general maritime law against Smith Marine Towing Corporation from February 7-8, 2011. This Court has original jurisdiction over this matter pursuant to the Jones Act and the Court's admiralty jurisdiction under 28 U.S.C. § 1333.  After hearing live testimony and reviewing all the evidence, the Court rules as follows.  To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such.  To the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

**I.   FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**A.   Background**

Ledet brought this action as a result of a back injury he sustained when he was struck by a towline on October 17, 2009 while working for Smith Marine.  Ledet began to work for Smith

Marine as an experienced deckhand in 2007.[1]  Before that, Ledet held a number of different jobs.  After dropping out of high school in the ninth grade, Ledet worked as a marsh buggy repair person and a barge cleaner.  Ledet then worked offshore as a rigger, a spacer, and as a welder helper.[2]  Ledet also worked as a deckhand for Central Gulf Towing from 2000 to 2007.[3]  Ledet has no formal training as a deckhand, having learned on-the-job.  At the time of the incident that gave rise to this litigation, Ledet was 40 years old and was making $215 per day.[4]

**B.   The October 17, 2009 Accident**

On October 17, 2009, Ledet was assigned to the SMITH HUNTER, a sea-going tug owned by Smith Marine.  The crew working with Ledet on that date consisted of Captain Randy Martin, Relief Captain Todd Delaune, and Sean Martin, Captain Martin's son.[5] The SMITH HUNTER was towing an unloaded offshore deck barge, the Tideland No. 21, from a dock near Amelia, Louisiana to the Eugene Island Sea Buoy in order to release it to the awaiting HARVEY

---

[1]    (Trial Tr. (Day II, Morning) at 73; Tr. Ex. 13.65.)

[2]    (Trial Tr. (Day II, Morning) at 70-71.)

[3]    (*Id.* at 73; Joint Ex. 13.65.)

[4]    (Trial Tr. Day II, Morning) at 70, 78.)

[5]    (Trial Tr. (Day I, Morning) at 7; Trial Tr. (Day II, Morning) at 80.)

INVADER, a substantially larger tug.[6]  The Tideland No. 21 was
equipped with its own towing equipment, or "chain bridle," which
consisted of two chains attached to its front corners connected
by a "fishplate" and a pendant wire that extended from the
fishplate to the SMITH HUNTER.[7]  The "socket" of the pendant wire
was attached to the "hard eye" of the SMITH HUNTER's "snatch
line"[8] by a "shackle."[9]  The snatch line is a double rope
connected to the SMITH HUNTER'S towing wench, which is located in
the center stern of the vessel.[10]  A "shackle" is a metal device
that can be opened and closed.[11]  Captain Martin testified that
the Tideland No. 21's chain bridle made it different from the
barges he had towed on other occasions.[12]  In other instances,
the tug's towing gear attached directly to the barge, without the
use of a pendant wire.[13]

---

[6]     (Trial Tr. (Day I, Morning) at 12; Trial Tr. (Day II,
Morning) at 81-82.)

[7]     (Trial Tr. (Day I, Morning) at 11, 68-69; Def.'s Ex. 2;
Tr. Ex. 33.)

[8]     The "snatch line" is also referred to as the "shock
line."

[9]     (Trial Tr. (Day I, Morning) at 21-22.)

[10]    (Trial Tr. (Day I, Morning) at 21-22; Tr. Ex. 6.18.)

[11]    (Trial Tr. (Day I, Morning) at 11.)

[12]    (*Id.* at 11.)

[13]    (*Id.*)

Before arriving at the Eugene Island Sea Buoy, Captain Martin, Ledet, and Sean Martin convened for a joint safety analysis (JSA), during which they discussed the method for releasing the Tideland No. 21 and its towing equipment to the HARVEY INVADER.[14]  Captain Martin instructed Ledet and Sean Martin that they would retrieve the Tideland No. 21's pendant wire to a point where it would be positioned over the stern deck of the SMITH HUNTER.[15]  Captain Martin would then have one of the deckhands insert the SMITH HUNTER's starboard norman pin into its holster at the extreme stern of the vessel.[16]  A norman pin is a four-foot medal rod that sticks up two to three feet from the grating in the stern of the vessel when in place.[17]  Once the norman pin was inserted, Captain Martin would pivot the vessel so that the Tideland No. 21's pendant wire was resting against the norman pin and then instruct the deckhands to tie the pendant wire to the norman pin.  The purpose of securing the pendant wire was to allow Martin to create slack in the pendant wire and the snatch line so that the two could be unshackled.  During the JSA,

---

[14]     (*Id.* at 15, 71.)

[15]     (*Id.* at 19.)

[16]     (*Id.* at 19.)

[17]     (*Id.* at 20, 82.)

there was a miscommunication as to which rope Captain Martin intended for the deckhands to use when tying the pendant wire.[18] Captain Martin wanted the pendant wire tied with a soft, nylon rope that Sean Martin had prepared for that purpose,[19] but Captain Martin did not specify that to Ledet.[20]

After the pendant wire was attached to the norman pin, the deckhands – while standing on the port side of the vessel – would then disconnect the shackle linking the Tideland No. 21's pendant wire to the SMITH HUNTER's snatch line.[21] Once the shackle was disconnected, the deckhands would then throw a 100-foot line attached to the Tideland No. 21's towing gear to the HARVEY INVADER from the starboard side of SMITH HUNTER, allowing the HARVEY INVADER's crew to pull the barge's towing gear onto that vessel.[22]

At the JSA, Ledet proposed an alternate method for disconnecting the Tideland No. 21's towing gear that he had seen

---

[18]    (*Id.* at 44-45.)

[19]    (*Id.* at 23-25.)

[20]    (*Id.* at 45.)

[21]    (*Id.* at 25.)

[22]    (*Id.* at 26-28.)

used by other captains.[23]  Ledet suggested using the SMITH
HUNTER's anchor drum wire, or "suitcase wire," to secure the
Tideland No. 21's pendant wire during the transfer.[24]  The
suitcase wire is attached to the anchor drum, which is a small
wench located directly below the towing wench in the center stern
of the vessel.  Under Ledet's plan, the suitcase wire, which is
outfitted with a "pelican hook," would have been attached to the
pendant wire with a second shackle, or "slider," placed behind
the pendant wire's socket.[25]  The suitcase wire would have been
used to "suck up" the pendant wire to a point where the crew
could disconnect it from the shackle connecting it to the snatch
line.[26]  Captain Martin rejected Ledet's proposal to secure the
pendant wire with the suitcase wire because tying the pendant
wire to the norman pin would take less time.[27]

The SMITH HUNTER arrived at the Eugene Island Sea Buoy at
approximately 2:30 a.m.[28]  Ledet was sleeping in his cabin, and

---

[23]    (*Id.* at 18; Trial Tr. (Day II, Morning at 85-87.)

[24]    (Trial Tr. (Day II, Morning) at 86.)

[25]    (Trial Tr. (Day II, Afternoon) at 30; Def.'s Ex.
D5.192.)

[26]    (Trial Tr. (Day II, Afternoon at 30.)

[27]    (Trial Tr. (Day II, Morning) at 85-86.)

[28]    (*Id.* at 88.)

6

Sean Martin woke him up so that Ledet could assist with the transfer.  At the time, the sea conditions were somewhat rough, with three- to five-foot waves and wind at 20 to 25 miles per hour.[29]  Captain Martin was in the "doghouse" on the starboard side of the vessel,[30] which provided him with a bird's-eye view of the stern deck,[31] and he was equipped with a PA system that allowed him to be heard by the deckhands.

Ledet exited the interior of the vessel from the back door on the port side.[32]  On his way out, he grabbed a plastic rope hanging near the door.[33]  Ledet then approached the norman pin from the port side and used the plastic rope to tie the Tideland No. 21's pendant wire to the norman pin.[34]  Ledet then walked around the bow of the SMITH HUNTER in order to get to the starboard side, where he waited underneath the doghouse.[35] Sometime after, Martin used the PA system to order Ledet to tie the pendant wire to the norman pin using the nylon rope that Sean

---

[29]    (Trial Tr. (Day I, Morning) at 44.)

[30]    (Trial Tr. (Day II, Morning) at 92.)

[31]    (*Id.* at 93.)

[32]    (*Id.* at 90.)

[33]    (*Id.* at 89-90.)

[34]    (Trial Tr. (Day II, Morning 90-91.)

[35]    (*Id.* at 92-94.)

7

Martin had prepared.[36]  By then, Sean Martin had placed the nylon
rope on the starboard grating in the stern of the vessel,
adjacent to the norman pin.[37]  Following Martin's orders, Ledet
approached the norman pin from the starboard side.[38]  When Ledet
reached the starboard grating, the vessel dipped in the trough of
a wave, and the pendant wire came untied and slipped over the
norman pin, striking Ledet, throwing him against the vessel's
bulwarks, and knocking him unconscious.[39]  At that time, the
HARVEY INVADER was pulling up on the starboard side of the SMITH
HUNTER and was not yet parallel to the vessel.[40]  Although Ledet
understood that the starboard side of the vessel was a "pressure
zone" or "danger zone" until the pendant wire was released from
the snatch line,[41] he testified that he thought there was slack
in the pendant wire at the time Captain Martin ordered him to tie
the pendant wire to the norman pin with the nylon rope.[42]  Martin
also testified that it was his intention to keep slack in the

---

[36]    (*Id.* at 95.)

[37]    (*Id.* at 96-97.)

[38]    (*Id.* at 95-96.)

[39]    (*Id.* at 97.)

[40]    (*Id.*)

[41]    (Trial Tr. (Day II, Afternoon) at 40.)

[42]    (Trial Tr. (Day II, Morning) at 99.)

8

line once the pendant wire was tied to the norman pin.[43]

While Captain Martin provided a different account of how Ledet was injured, the Court does not find his testimony credible.  Martin's version of the events is that Ledet initially tied the line from the starboard side and was struck as he walked away.[44]  The Court observed Martin's demeanor at trial and found him to be evasive and defensive.  Martin was terse when recounting his version of the events, and his testimony regarding the miscommunication at the JSA and the sea conditions at the time of the accident had to be pulled out of him by Ledet's attorney.[45]  Similarly, Martin contradicted himself by first not remembering specifics about what occurred at the JSA, and then suddenly recalling details that fit his version of the events.  Further, Martin contradicted himself about what rope was supposed to be used to tie the pendant wire to the norman pin, initially stating that the crew was to use "any rope" but then admitting that he wanted the crew to use the nylon rope.[46]  Further, even though Martin had a clear view of the stern deck from the

---

[43]    (Trial Tr. (Day I, Morning) at 41-2.)

[44]    (*Id.* at 37-39.)

[45]    (Trial Tr. (Day I, Morning) at 38, 44-45.)

[46]    (*Id.* at 23.)

doghouse, Martin testified that he did not know how Ledet ended up on the starboard side of the vessel.[47]   Finally, Martin's testimony that Ledet was standing on the starboard side of the norman pin when he tied the pendant wire using the plastic rope is inconsistent with defense counsel's position in its proposed findings of fact, which stated that Ledet properly tied the pendant wire from the port side and then inexplicably appeared on the starboard side.[48]   This inconsistency further undermines Martin's credibility.   By contrast, Ledet provided a coherent narrative of the events surrounding his accident, and his demeanor was more suggestive of veracity.   For these reasons, the Court credits Ledet's version of the events over Martin's.

After the accident, Sean Martin awoke Relief Captain Todd Delaune.[49]   Delaune left his sleeping quarters and exited onto the deck from the port side of the vessel.   Delaune then proceeded to jump over the snatch line, which was then slack, to reach the starboard side, where Ledet had been thrown by the pendant wire against the bulwarks.[50]   Delaune administered first-

---

[47]   (*Id.* at 35.)

[48]   (*Id.* at 35, 48; *compare* R. Doc. 25 at 4.)

[49]   (*Id.* at 84-85.)

[50]   (*Id.* at 85.)

aid to Ledet and assisted him into the galley.[51]  Delaune then went back on deck to unshackle the Tideland No. 21's pendant wire and transfer it to the HARVEY INVADER from the starboard side. By that time, the HARVEY INVADER had pulled alongside the SMITH HUNTER, which kept the SMITH HUNTER from bouncing in the waves. As a result, the towline was slack on the deck, and Delaune was able to make the transfer quickly without securing the pendant wire.[52]

## C.  Negligence

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc).  The fundamental duty of a Jones Act employer is to provide his seaman employees with a reasonably safe place to work.  *Colburn v. Bunge Towing*, Inc., 883 F.2d 372, 374 (5th Cir. 1989).  In *Gautreaux*, the Fifth Circuit clarified that an employer is liable under the Jones Act if the negligence of its employees or agents played "any part, even the slightest" in causing the injury or death for which damages are sought.  107

---

[51]   (*Id.* at 86; Trial Tr. (Day II, Morning) at 97, 100.)

[52]   (Trial Tr. (Day I, Morning) at 92.)

11

F.3d at 335 (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957)).  At the same time, the employer's standard of care is not greater than that of ordinary negligence under the circumstances.  *Id.* at 339.  In addition, the seaman's duty of care is not a "slight" duty of care to protect himself from the employer's negligence.  *Id.*  Rather, the seaman is also obliged to act "with ordinary prudence under the circumstances," which include the seaman's reliance on his employer to provide a safe working environment and the seaman's own experience, training, or education.  *Id.*

Here, the Court finds that Captain Martin was negligent in a number of ways.  First, Captain Martin admitted that he was responsible for maintaining a safe working environment on the vessel.[53]  Yet, Captain Martin negligently created an unsafe condition by instructing the crew to attach the Tideland No. 21's pendant wire to the norman pin with a soft line.  The four-foot norman pin, which is narrow in diameter,[54] extended two to three feet above the stern grating and was positioned at the rear edge of the stern.  At the time of the accident, there were three- to five-foot waves and 20 to 25 mile-per-hour winds, and the barge

---

[53]    (Trial Tr. (Day I, Morning) at 5.)

[54]    (Tr. Ex. 6.18.)

12

was significantly higher out of the water than the tug.[55]  Using
a soft line to hold the pendant wire against the narrow norman
pin in such conditions defies common sense, because the tail of
the tug going in an up and down motion could pull the towline
over the top of the pin.  Applying lateral pressure to the norman
pin could also cause the line to jump over the norman pin.
Further, Martin created a dangerous "pressure zone" on the
starboard side of the vessel.  Even if the creation of a pressure
zone is appropriate in some circumstances, doing so using a
norman pin in rough sea conditions was negligent, especially
given that Martin was unaccustomed to towing barges equipped with
a pendant wire.  Moreover, by creating that pressure zone on the
starboard side – the same side on which Martin planned to have
the deckhands transfer the Tideland No. 21 to the HARVEY INVADER
– Martin unreasonably put the crew in harm's way.

    The Court finds support for its conclusion in the trial
testimony of Captain Ronald Campana, an expert in the field of
marine safety, who indicated that norman pins are not designed
for the purpose of creating an intentional pressure zone through
lateral force.  Campana testified that the operation was
dangerous because either the lateral pressure or the vessel

---

[55]     (Trial Tr. (Day II, Afternoon) at 80.)

moving up and down in rough seas could force the towline over the top of the norman pin.[56]  Campana also testified that he could not conceive using a norman pin for the purpose of transferring a barge under any circumstances.[57]  According to Campana, a more prudent way to secure the pendant wire would have been either to use either the vessel's suitcase wire, as Ledet suggested during the JSA, or to create a "stopper," which is a common practice on sea-going tugs.[58]  Campana further testified that, when making a barge transfer, the barge should be directly behind the tug so that there is no pressure on the towline to either port or starboard.[59]  Campana opined that, if Martin were going to create a pressure zone, it should not have been to starboard, since the HARVEY INVADER was approaching on the starboard side, and the deckhands were required to be on that side to pass the pendant wire to the receiving tug.[60]

The Court credits Campana's testimony over the testimony of Captain Tim Anslemi.  Campana provided detailed explanations and

---

[56]    (Trial Tr. (Day I, Afternoon) at 159.)

[57]    (*Id.*)

[58]    (*Id.* at 139.)

[59]    (*Id.* at 140.)

[60]    (*Id.* at 143.)

reasoning for his opinions.  And his conclusions are supported by the *U.S. Navy Towing Manual*, which states that the transfer of a barge should be performed using a stopper and illustrates that the barge's pendant wire should be kept in a straight line behind the tug's towing wench.[61]  Anslemi, by contrast, offered few details and no independent support for his assertion that using the norman pin was a safe method for conducting the transfer.  In addition, although Anslemi said that he had seen norman pins commonly used to secure pendant wires in barge transfers, Anslemi acknowledged that those norman pins were of a different, more sophisticated design than the one used aboard the SMITH HUNTER.[62]

The Court finds that Captain Martin was also negligent by initiating the operation before the HARVEY INVADER had pulled alongside the SMITH HUNTER.  Because securing the pendant wire to the norman pin created a dangerous condition aboard the ship, Captain Martin should have waited to secure the pendant wire until the HARVEY INVADER was prepared to receive the barge.  That course of action would have been consistent with the *U.S. Navy Towing Manual*, which instructs that the captain should "[s]ignal the receiving tug to come close aboard on the designated side on

---

[61]   (Ob. Tr. Ex. 2.2-2.3.)

[62]   (Trial Tr. (Day II, Afternoon) at 61-62.)

15

a parallel course" before securing the barge's pendant wire.[63]
Also, waiting until the HARVEY INVADER was parallel to the SMITH
HUNTER would have stabilized the barge.  As Delaune testified, he
was able to unshackle the pendant without difficulty after
Ledet's accident, in part, because, by that time, the HARVEY
INVADER had moved along side the SMITH HUNTER, preventing the
SMITH HUNTER from "rolling" or "bouncing" in the waves.[64]  Had
Martin waited until the much larger tug was alongside the SMITH
HUNTER, the sea conditions would have been more stable, reducing
the risk of an accident.

Finally, Martin was negligent in not clearly communicating
at the JSA that he intended for Ledet to use the nylon rope when
securing the pendant wire to the norman pin.  Martin acknowledged
at trial that it is the captain's responsibility during a JSA to
prepare the crew for an upcoming operation.[65]  Martin also
admitted that he did not specify who was to do what during the
transfer as between Ledet and Sean Martin.[66]  And Campana
testified that the JSA was deficient because Martin did not

---

[63]   (Ob. Tr. Ex. 2.2.)

[64]   (Trial Tr. (Day I, Morning) at 92.)

[65]   (*Id.* at 5.)

[66]   (*Id.* at 31-32.)

ensure that the crew understood the specifics of the transfer.[67]
Even if Ledet misunderstood Martin's instructions regarding the
rope Martin wanted used, Martin, as captain, should have made his
instructions clear during the JSA.  Had Martin fulfilled this
obligation to inform Ledet clearly of which rope to use in the
first instance, there would have been no need for Ledet to tie
the norman pin from the starboard side.

Smith Marine incorrectly asserts that Ledet was
contributorily negligent in approaching the norman pin from the
starboard side of the vessel.  Captain Martin should never have
had the pendant wire tied to the norman pin in the first place.
Also, as discussed above, the Court credits Ledet's testimony
that he approached the norman pin to tie the pendant wire under a
direct order from Martin.  At that time, the nylon rope that
Martin ordered Ledet to use was located on the vessel's starboard
grating, requiring Ledet to approach from that side.  It was not
unreasonable for Ledet to comply with Martin's order, given
Martin's superior vantage point and control of the vessel and
that Martin led Ledet to believe there would be slack in the line
during the transfer.[68]  Moreover, Captain Martin should never

---

[67]     (Trial Tr. Day I, Afternoon) at 144-45.)

[68]     (Trial Tr. (Day I, Morning) at 29-30; Trial Tr. (Day
II, Morning) at 94.)

have ordered Ledet back onto the rear deck of the tug to tie the pendant wire with the nylon rope, as there is no evidence that one rope was better than the other, and, as noted, the operation was conceptually flawed from a safety standpoint from the get go. Finally, the Court rejects Smith Marine's suggestion that Ledet was impaired by drug use at the time of the accident.  In doing so, the Court credits Ledet's testimony that he smoked marijuana only after the accident in order to alleviate his pain.[69]

Because the Court finds that Ledet's accident was caused by Martin's negligence and that Ledet was not contributorily negligent, Smith Marine is 100 percent responsible for Ledet's damages.

**D.   Unseaworthiness**

To establish a claim for unseaworthiness, "the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is used.  In addition, the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th

---

[69]     (Trial Tr. (Day II, Morning) at 100-01.)

Cir. 2002) (citing *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th
Cir. 2001)).  A vessel's unseaworthiness may arise from various
circumstances, including defective gear, appurtenances in
disrepair, an unfit crew, an improper method of loading cargo, or
an insufficient number of workers assigned to perform a shipboard
task.  *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499
(1971).  A finding of unseaworthiness, however, cannot be based
on an "isolated, personal negligent act."  *Usner v. Luckenbach
Overseas Corp.*, 400 U.S. 494, 500 (1971).  Instead,
unseaworthiness must be the result of a condition that persists
for such time as to become related to the status of the vessel.
*Kyzar v. Vale Do Ri Doce Navegacai, S.A.*, 464 F.2d 285, 290 (5th
Cir. 1972).  A plaintiff asserting a claim of unseaworthiness
need not establish negligence, but bears the burden to show that
the unseaworthy condition "played a substantial part in bringing
about or actually causing the injury and that the injury was
either a direct result or a reasonably probable consequence of
the unseaworthiness." *Phillips v. Western Co. of North America*,
953 F.2d 923, 928 (5th Cir. 1992).

The Court finds that the SMITH HUNTER was not unseaworthy at
the time of Ledet's accident.  Ledet presented no evidence that
the vessel, its gear, or appurtenances were in any way defective
or contributed to his injury.  Nor did Ledet establish that the

19

SMITH HUNTER was manned by an unfit crew.  Although Ledet's injuries resulted from Captain Martin's negligence, that negligence was limited to the execution of a single operation, namely, securing the pendant wire to the norman pin during the transfer.  There has been no suggestion that Captain Martin's performance as captain was deficient beyond the incident at issue.  To the contrary, in his statement following the accident, Ledet conceded that Captain Martin was generally a good captain.[70]  Accordingly, the Court finds that Captain Martin's negligent conduct did not persist over such a period of time as to create a condition of unseaworthiness.  *See Kyzar*, 464 F.2d at 290-91 (explaining that unseaworthiness based on an unfit crew must involve a continuous course of negligent conduct).  Further, while Ledet characterized Sean Martin as lazy,[71] there is no evidence to indicate that any such laziness played a substantial part in bringing about or actually causing Ledet's injury.  For these reasons, the Court rejects Ledet's argument that the SMITH HUNTER's alleged unseaworthiness was a cause of his accident.

**E.   Extent and Causation of Ledet's Injuries**

---

[70]   (Tr. Ex. 11.25).

[71]   (Trial Tr. (Day II, Morning) at 80-81.)

20

As discussed above, Ledet was transferred to the galley after he regained consciousness with the assistance of Delaune. Ledet sat in the galley "for a little while and [ ] asked if anybody had anything for pain."[72] At that time, Ledet felt intense back pain from his neck to his belt line.[73] Martin offered Ledet some marijuana in order to alleviate the pain.[74] Ledet then smoked the marijuana and laid down.[75] When the SMITH HUNTER arrived in Morgan City, Ledet was taken to Teche Regional Hospital.[76] Ledet underwent a CT scan, which indicated that Ledet had broken his back, suffering a compression fracture of the L1 vertebrae resulting in a 30 to 40 percent loss in vertebral body height.[77]

On October 22, 2009, Dr. Brett Chaisson examined Ledet and assessed him as having T12 and L1 compression fractures.  In his treatment notes, Chaisson wrote that Ledet "will be completely off work for the time being."[78]  Ledet was given a back brace and

---

[72]   (*Id.* at 100.)

[73]   (*Id.* at 100-01.)

[74]   (*Id.*)

[75]   (*Id.*)

[76]   (*Id.* at 103; Tr. Ex. 20.3.)

[77]   (Tr. Ex. 20.16.)

[78]   (Tr. Ex. 23.10.)

prescribed pain medication.[79]  Ledet underwent an MRI on October
29, 2009, which confirmed a moderate compression fracture of the
superior endplate of L1 and a mild compression fracture at T12.[80]
According to Ledet, the back brace given to him by Dr. Chaisson
did not relieve his pain, although he wore it consistently
throughout the day.[81]

Ledet began receiving treatment from Dr. Socrates Zapata
Campusano at the Advanced Pain Institute on November 20, 2009.[82]
Ledet complained of severe mid- and lower-back pain that began
after the October 17, 2009 accident.[83]  Ledet was diagnosed with
a lower-back compression fracture of T12 and L1 with edema,
which, according to Campusano, was consistent with a recent
injury.[84]  Campusano advised Ledet that he could receive a
kyphoplasty, which is a one-day surgery involving attachment of
cement to stabilize compressed vertebrae.[85]  Campusano also
offered a more conservative treatment of epidural steroid

---

[79]    (Tr. Ex. 23.10.)

[80]    (Tr. Ex. 23.11.)

[81]    (Trial Tr. (Day II, Morning) at 107.)

[82]    (Trial Tr. (Day I, Afternoon) at 162.)

[83]    (*Id.* at 163.)

[84]    (*Id.* at 165-67.)

[85]    (*Id.* at 168; Tr. Ex. 23.14.)

injections,[86] the objective of which is to control the pain and
decrease inflammation around the area of the trauma.[87]  Ledet
elected to forego the kyphoplasty and to receive an injection,[88]
which was administered by Dr. Mohammed Elkersh – Campusano's
partner – on December 1, 2009.[89]

Chaisson saw Ledet for a follow-up visit on December 18,
2009.  During that visit, Chaisson noted that, because Ledet
continued to have significant pain, he would be referred to a
neurosurgeon.[90]  Ledet had an initial consultation with Dr.
Arthur Ulm on January 5, 2010.[91]  Ulm testified that Ledet's back
injuries were consistent with the type of injury that could
result from being struck by a cable and thrown against he
bulkhead of a vessel.[92]  With regard to treatment options, Ulm
stated that he would not have recommended kyphoplasty to someone
in Ledet's condition, because kyphoplasty is typically used only
for pain management, not to maintain stability.  Kyphoplasty is

---

[86]     (Trial Tr. (Day I, Afternoon) at 168; Tr. Ex. 23.15.)

[87]     (Trial Tr. (Day I, Afternoon) at 170.)

[88]     (*Id.* at 167-68.)

[89]     (*Id.* at 169.)

[90]     (Tr. Ex. 23.7.)

[91]     (Trial Tr. (Day II, Morning) at 3.)

[92]     (*Id.* at 6.)

FDA approved for osteoporotic type compression fractures. Performing a kyphoplasty on Ledet would have been an option, but it would have been an "off-label use."[93]  Ulm prescribed Lortab for pain, instructed Ledet on proper care and management of his back pain, and scheduled a follow up visit.  It was Ulm's opinion that Ledet was not able to return to work at the time.[94]

Ulm saw Ledet again on February 2, 2010.[95]  Because Ledet had not responded to four months of conservative treatment, Ulm then offered a surgical fixation of Ledet's fractures.[96] According to Ulm, surgery was appropriate for Ledet given the severity of Ledet's multiple fractures and to prevent worsening of his condition.[97]  Ulm also informed Ledet that, while one of the goals of the surgery was to relieve pain, chronic back pain was still a possibility.[98]  Ulm informed Ledet that the surgery would offer a 70 percent chance of a 50 percent or more reduction in pain.[99]

---

[93]    (*Id.* at 4.)

[94]    (Trial Tr. (Day II, Morning) at 10.)

[95]    (*Id.* at 10; Tr. Ex. 26.19.)

[96]    (Trial Tr. (Day II, Morning) at 12.)

[97]    (Trial Tr. (Day II, Morning) at 5, 12.)

[98]    (*Id.* at 13.)

[99]    (*Id.*)

Ulm performed a laminectomy of Ledet's T11 to L2 vertebrae with a three-level fusion utilizing hardware on February 25, 2010.[100]  After the surgery, Ulm saw Ledet for a follow-up visit on April 27, 2010.  In his treatment notes, Ulm noted that "[o]verall, he is doing okay" and that Ledet was "moving around better" than the month before.  Ulm also noted that Ledet's incision was "well healed."[101]  Although Ledet was compliant with the recovery routine, Ledet continued to experience a substantial amount of pain following the surgery.[102]  Ledet's final visit to Ulm took place on July 27, 2010.[103]  At that time, Ulm determined that Ledet's fusion and implants were successful but that "his response with regards to pain has been less than satisfactory."[104]

Considering the live testimony at trial and the evidence submitted by the parties, the Court finds that Ledet's back injury was caused by the October 17, 2009 accident.  The Court credits Dr. Campusano's testimony that, when he examined Ledet on November 20, 2009, the edema associated with Ledet's fracture

---

[100]   (*Id.* at 14-17; Tr. Ex. 27.94-27.95.)

[101]   (Tr. Ex. 26.17.)

[102]   (Trial Tr. (Day II, Morning) at 20.)

[103]   (*Id.* at 27; Tr. Ex. 27.18.)

[104]   (Tr. Ex. 27.18.)

indicated that the injury occurred within two to four weeks of the visit.[105]  Although Smith Marine suggested at trial that Ledet's injuries may have been caused by a car accident that took place in February 2009, the Court rejects Smith Marine's theory. Ledet was capable of working as a deckhand until his accident on October 17, 2009.  As Dr. Ulm testified, had Ledet suffered from a substantial injury before the accident, it is unlikely that he would have been able to perform that work.[106]  Moreover, according to Ulm, Ledet's injuries appeared "fresh" when he examined Ledet in January 2010, unlike an injury that occurred almost a year before.[107]  Accordingly, the Court concludes that the accident on October 17, 2009 caused the injury to Ledet's back.

**E.    Maintenance and Cure**

Seamen have a right to maintenance and cure[108] for injuries suffered by them in the course of their duties on a vessel.  *See* *O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42

---

[105]    (Trial Tr. (Day I, Afternoon) at 166.)

[106]    (Trial Tr. (Day II, Morning) at 33.)

[107]    (*Id.* at 33-34.)

[108] Maintenance is a daily stipend for living expenses; cure is the payment of medical expenses.  *See Guevara v. Maintenance Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995).

(1943).  Before plaintiff can recover maintenance and cure, he
bears the burden of alleging and proving the following facts: (a)
his engagement as a seaman, (b) that his illness or injury
occurred, was aggravated or manifested itself while in the ship's
service, (c) the wages to which he may be entitled, and (d) the
expenditures or liability incurred by him for medicines, nursing
care, board, and lodging.  *See Foster, III v. Brian's Trans.
Serv. et al.*, 1993 WL 114528, *2 (E.D. La. 1993) (citing Martin
Norris, 2 *The Law of Seamen* § 26.21 at 53 (Supp. 1992)).  A
plaintiff need not present any proof of negligence or fault on
the part of the employer to establish his entitlement to
maintenance and cure.  *See id.*  Moreover, "[m]aintenance is
neither a substitute for wages nor is it to be considered in lieu
of a seaman's wages, in whole or in part." *Colburn v. Bunge
Towing, Inc.*, 883 F.2d 372, 378 (5th Cir. 1989) (quoting *Morel v.
Sabine Towing & Transportation Co.*, 669 F.2d 345 (5th Cir.
1982)); *see also Ceja v. Mike Hooks, Inc.*, 690 F.2d 1191, 1197
(finding erroneous the district court's deduction of maintenance
paid from an award of past lost wages).

Generally, a maritime employer's obligation to provide
maintenance and cure ends when a doctor provides a qualified
medical opinion that plaintiff has reached maximum medical
improvement.  *Breese v. AWI, Inc.*, 823 F.2d 100, 104 (5th Cir.

27

1987). A seaman reaches maximum medical improvement when it appears "probable that further treatment will result in no betterment in the claimant's condition." *Rashidi v. Am. Pres. Lines*, 96 F.3d 124, 128 (5th Cir. 1996). "[A]mbiguities or doubts in the application of the law of maintenance and cure are resolved in favor of the seaman." *Gaspard v. Taylor Driving & Salvage Co.*, 649 F.2d 372, 374 n.2 (5th Cir. 1981). "[W]here it appears that the seaman's condition is incurable, or that further treatment will merely relieve pain and suffering, but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum medical cure has been achieved." *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

Because Ledet broke his back while in the service of a vessel, he was entitled to maintenance and cure until the point of maximum medical improvement for that injury. Ledet's treating physician, Dr. Ulm, testified that Ledet reached maximum medical improvement from a physical and functional standpoint by the time of his July 27, 2010 visit and that Ledet's pain is the only outstanding issue.[109] Ulm explained that, at this point, Ledet's options are to either have an internal pain pump installed or to

---

[109] (Trial Tr. (Day II, Morning) at 41.)

control his pain through oral pain medication.[110]  The Court
rejects Ledet's attorney's suggestion at trial that Ledet has not
reached maximum medical improvement because he has not yet had
the pain pump installed.  While Ulm testified that a pain pump
may increase Ledet's mobility, the same is true for all other
types of pain control.  Plaintiff's argument is therefore
inapposite.  Installation of the pain pump would not improve
Ledet's physical condition, but would instead allow him to better
cope by relieving his pain.  In addition, as discussed below, the
Court does not find it credible that Ledet will, in fact, have
the pain pump installed.  Further maintenance and cure is not
appropriate under these circumstances.  *See, e.g.*, *Harris v.
Omega Protein, Inc.*, 2006 WL 2067717, *5 (E.D. La. 2006) (finding
that plaintiff had reached maximum medical cure because further
treatment would address only pain management).  Accordingly, the
Court finds that Ledet was entitled to maintenance and cure from
October 17, 2009 through July 27, 2010, a total of 283 days.

Smith Marine has paid the entirety of Ledet's medical
expenses to date.[111]  Smith Marine has also paid Ledet $1,272 per

---

[110]    (*Id.* at 21-23.)

[111]    (Trial Tr. (Day II, Afternoon) at 2.)

week since the date of his accident.[112]  Smith Marine argues that
it is entitled to a reduction in any damages awarded by the
amount it overpaid in either wages or maintenance.  Ledet, by
contrast, argues that the weekly payment was insufficient to
cover both wage continuation and maintenance.  Unfortunately,
neither Smith Marine nor Ledet provides specifics as to what the
$1,272 weekly payment represents.  The Court will therefore
estimate what Ledet would have received in wages per week had he
continued to work as a deckhand for Smith Marine, and then
subtract that amount from $1,272 in order to determine how much
of the payment, if any, was maintenance.

It is undisputed that Ledet earned $215 per day that he
worked offshore while employed by Smith Marine.  According to
Ledet's economist, Dr. G. Randolph Rice, Ledet was paid for
approximately 284 days per year before his accident.  Put
differently, the ratio of days that Ledet actually worked to
calendar days was 284 / 365, or 0.778.  In estimating what Ledet
would have received in wages per calendar day had he not been
injured, the Court must therefore multiply that ratio by $215,
the wage Ledet was paid per work day, as Ledet would not have
worked every calendar day for which he received wage

---

[112]    (Tr. Ex. 17.)

continuation.  The result is an average daily wage of $167.27 ($215 * 0.778) and an average weekly wage of $1,170.89 ($167.27 * 7).  The Court therefore finds that $1,170.89 of the $1,272.00 per week paid to Ledet since his accident represents wage continuation.  Accordingly, Smith Marine paid Ledet $101.11 per week ($1,272.00 - $1,170.89), or $14.44 per day ($101.11 / 7), in maintenance.

Because, as discussed above, Ledet was entitled only to maintenance payments until July 27, 2010, any amount awarded to Ledet by the Court must be reduced by the amount of maintenance Smith Marine paid to Ledet after that date and until trial.  *See Huss v. King Co., Inc.*, 338 F.3d 647, 651-52 & n.5 (6th Cir. 2003) (upholding the district court's reduction of damages by the amount defendant overpaid in maintenance and cure); *Kezic ALASKA SEA*, 2006 WL 2439811, *4 (W.D. Wash. 2006) (reducing damages amount by overpayment of maintenance).  One hundred and ninety four days passed between July 27, 2010 and the commencement of trial on February 7, 2011.  Accordingly, the Court finds that Ledet's received $2,801.36 ($14.44 * 194) in maintenance that he was not entitled to, and that that amount must be credited against any award that Ledet receives.

The Court must also evaluate whether the $14.44 per day in maintenance paid to Ledet between October 17, 2009 and July 27,

31

2010 was the appropriate rate.  In calculating the proper
maintenance rate, the Court must first estimate the "plaintiff
seaman's actual costs of food and lodging; and the reasonable
cost of food and lodging for a single seaman in the locality of
the plaintiff."  *Hall v. Noble Drilling (U.S.), Inc.*, 242 F.3d
582, 590 (5th Cir. 2001).  In order to recover maintenance, the
seaman plaintiff must produce "evidence to the court that is
sufficient to provide an evidentiary basis for the Court to
estimate his actual costs."  *Id.*  Provided he has incurred the
expense, the seaman is entitled to the reasonable cost of food
and lodging.  *Id.* at 587.  To determine the reasonable costs of
food and lodging, the Court may consider evidence of "the
seaman's actual costs, evidence of reasonable costs in the
locality or region, union contracts stipulating a rate of
maintenance or per diem payments for shoreside food or lodging
while in the service of a vessel, and maintenance rates awarded
in other cases for seamen in the same region."  *Id.* at 590.  "A
seaman's burden of production in establishing the value of
maintenance is feather light: his own testimony as to reasonable
cost of room and board in the community where he is living is
sufficient to support an award."  *Yelverton v. Mobile Labs.,
Inc.*, 782 F.2d 555, 558 (5th Cir. 1986) (citing *Curry v. Fluor
Drilling Servs., Inc.*, 715 F.2d 893 (5th Cir. 1983)).  Lodging

includes those expenses "necessary to the provision of habitable housing," including utility costs. *Hall*, 242 F.3d at 587 n.17 (citing *Gillikin v.. United States*, 764 F. Supp. 270, 273 (E.D.N.Y. 1991)).  Yet, "[a] seaman need not present evidence of the reasonable rate; a court may take judicial notice of the prevailing rate in the district." *Hall*, 242 F.3d at 590. Second, after the court calculates the plaintiffs actual costs and the reasonable costs, the Court must compare the two.  "If actual expenses exceed reasonable expenses, the court should award reasonable expenses.  Otherwise, the court should award actual expenses." *Id.*

Before and for some time after the accident, Ledet lived with his mother, Thelma Farve, in Robert, Louisiana.[113]  Ledet testified that, before the accident, he provided her with $900 per month for food, lodging, and utilities.[114]  And Farve testified that Ledet continued to provide her with those payments after he was injured.[115]  The Court finds that the $900 Ledet paid to his mother both before and after the accident is a reasonable estimate of Ledet's current monthly expenses, and that Ledet's

---

[113]   (Trial Tr. (Day I, Afternoon) at 202, 209)

[114]   (Trial Tr. (Day II, Morning) at 113.)

[115]   (Trial Tr. (Day I, Afternoon) at 206-07.)

and Farve's testimony was sufficient to meet Ledet's "feather light" burden of establishing actual expenses. *See Everett v. Atlantic Sounding Co., Inc.*, 2009 WL 1668507, *10 (E.D. La. 2009) (estimating plaintiff's actual expenses based on post-accident payments made to his mother for food and rent), *rev'd in part on other grounds*, 388 F. App'x 399 (5th Cir. 2010). The Court therefore estimates Ledet's actual expenses to be $29.59 ($900 / (365 / 12)).

The parties have not presented evidence on the "reasonable costs" of maintenance. Absent such evidence, the Court looks to recent judicial decisions to determine the prevailing reasonable rate in this locality. Courts have approved rates ranging from $30 to $37 per day. *See, e.g.*, *Hall*, 242 F.3d at 591 (upholding district court's finding that maintenance rates of $30.50 and $31.50 were reasonable amounts for single seamen); *Nelson v. Cenac Towing Co., LLC*, 2011 WL 289040, *22 (E.D. La. 2011) (finding that a maintenance rate of $35.00 per day is reasonable); *Harrison v. Diamond Offshore Drilling, Inc.*, 2008 WL 708076, *22 (E.D. La. 2008) (finding that a maintenance rate of $37.00 per day is reasonable); *Nichols v. Weeks Marine, Inc.*, 513 F. Supp. 2d 627, 639 (E.D. La. 2007) (finding that a maintenance rate of $30.00 per day is reasonable and appropriate); *Atlantic Sounding Co. v. Curette*, 2006 WL 1560793,

34

*3 (E.D. La. 2006) (finding maintenance rate of $30.00 per day reasonable).  Considering that Ledet's actual expenses of $29.59 per day do not exceed the amounts found reasonable in the foregoing cases, the Court finds that Ledet was entitled to that amount for the 283 days between October 17, 2009 and July 27, 2010, a total of $8,373.97.  Smith Marine's total maintenance payments during that period amounted to only $4,086.52 ($14.44 * 283), leaving a shortfall of $4,287.45 ($8,373.97 – $4,086.52).  Crediting Smith Marine for the total maintenance it paid to Ledet after he reached maximum medical improvement, $2,801.36, leaves a balance of $1,486.09 ($4,287.45 – $2,801.36).  The Court finds that Smith Marine must now pay that balance to Ledet for maintenance.

In awarding Ledet additional maintenance, the Court reverses its ruling at trial under Rule 53(c) of the Federal Rule of Civil Procedure in favor of Smith Marine.  At that time, the Court was focused on the point at which Ledet reached maximum medical improvement, not whether Smith Marine's payments to Ledet were sufficient to cover both wage continuation and maintenance.  Having reviewed the record, the evidence presented by the parties, and the applicable law, the Court now concludes that an award of additional maintenance is appropriate.

## II.   DAMAGES

Under the Jones Act, a plaintiff may recover all of his pecuniary losses.  *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981), *rev'd on other grounds by Michel v. Total Transp., Inc.*, 957 F.2d 186, 191 (5th Cir. 1992).  Pecuniary loss may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.  *Daigle v. L & L Marine Transp. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004) (citing Thomas J Schoenbaum, *Admiralty and Maritime Law* § 5-15, at 234).  The parties have submitted two expert economic reports, one from Dr. Kenneth J. Boudreaux[116] (defendant's expert) and one from Dr. G. Randolph Rice[117] (plaintiff's expert).  Based on this evidence and the evidence presented at trial,[118] the Court makes its findings as to Ledet's damages as follows.

## A.   Past Lost Wages

Ledet is entitled to any wages that he would have earned had he continued to work as a deckhand through the date of trial,

---

[116]    (Tr. Ex. 19.)

[117]    (Tr. Ex. 20.)

[118]    The parties stipulated to the submission of written reports by the economic experts in lieu of live testimony.

less (1) any wages that Smith Marine paid him; and (2) any wages that he could have earned despite his physical condition.  *See Eugene v. Mormac Marine Transp., Inc.*, 48 F.3d 529, 1995 WL 840779, at *4 (5th Cir.1995) (finding appropriate an award for past lost wages up to the point at which defendant could return to work); *Daigle*, 322 F. Supp. 2d at 731 (subtracting amounts earned after plaintiff's injury from his past loss); *In re Diamond B Marine Servs., Inc.*, Civ. A. No. 99-951, 2001 WL 1164914, at *18 (E.D. La. 2001) (holding that allowing recovery for wages paid by plaintiff's employer would amount to "double recovery"); *Crum v. United States*, Civ. A. No. 99-2178, 2000 WL 943253, at *3 (E.D. La. 2000) (finding that where an injury did not prevent the plaintiff from returning to work, he was not entitled to past wages).  In the maritime context, an award for lost wages must be based on after-tax earnings.  *See Myers v. Griffin-Alexander Drilling Co.*, 910 F.2d 1252, 1256 (5th Cir. 1990) (citing *Hernandez v. M/V Rajaan*, 841 F.2d 582, 587 (5th Cir. 1988)).

Ledet contends that he has incurred past lost wages from the time of the accident to the date of trial totaling $50,000 after taxes.[119]  Although that figure is consistent with the past wage

---

[119]    (R. Doc. 32 at 4.)

loss indicated in Dr. Boudreaux's report, the Court finds that Smith Marine has paid Ledet the full amount of his wages since October 17, 2009.  As discussed above, Ledet has received weekly payments of $1,272 since the accident, and that amount exceeds the weekly salary that Ledet earned before the accident.  Because the amount paid by Smith Marine in wage continuation must be subtracted from the amount Ledet could have earned had he continued to work as a deckhand, *see Daigle*, 322 F. Supp. 2d at 731, Ledet is not entitled to an award of past wage loss.

**B.    Future Lost Wages**

The Fifth Circuit established the method for calculating future lost wages in maritime cases in *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983).  In that case, the court set forth a four-step process for determining lost wages as follows: (1) estimate the loss of work life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount that total to present value.  *Id.* at 517.  Any award for future lost wages in the maritime context also must be based on after-tax earnings. *Hernandez*, 841 F.2d at 587; *Culver*, 722 F.2d at 117 (stating that in calculating future lost earnings, "the fact-finder should subtract amounts that the wage earner would have been required to

38

pay, such as income tax and work expenses").

Both Ledet and Smith Marine presented testimony from vocational rehabilitation experts who offered assessments of Ledet's future employment and wage prospects.  Barney Hegwood, Ledet's expert, concluded that Ledet would not be able to return to any of his former jobs as a result of his injuries.[120]  Hegwood also concluded that Ledet's recent surgery and medical problems would be an impediment to finding an alternative occupation.[121] After conducting a series of academic tests, Hegwood approximated Ledet's IQ at 64, which indicates a mild mental handicap.[122] Based on Ledet's scores, Hegwood opined that it was very unlikely Ledet could go back to school to obtain a General Education Diploma (GED).  Hegwood testified that, although Ledet's physician had not assigned a functional limitation, based on his experience, Ledet would fall in the sedentary to light category of functionality, or potentially at the light end of the medium category.[123]  Hegwood further testified that, if Ledet were to find sedentary work, it would be for minimum wage considering his

---

[120]    (Trial Tr. (Day I, Afternoon) at 196.)

[121]    (*Id.* at 187.)

[122]    (*Id.* at 183.)

[123]    (*Id.* at 187-88.)

intellectual and educational limitations.[124]  Assuming that Ledet was given a pain pump, Hegwood testified that Ledet would then be limited to "sedentary work at the best"[125] and that Ledet would likely be restricted to three hours of work per day because the pain pump's electronic leads could be easily dislodged.[126]

Smith Marine's vocational expert, Nancy Favorolo presented a more optimistic opinion of Ledet's prospects.  Favorolo testified that Ledet's past work has been semi-skilled and that he has demonstrated an ability to apply common sense, to carry out instructions, and to learn new job tasks.[127]  Further, Favorolo concluded that, although she does not make assessments as to physical restrictions, she agreed with Hegwood that Ledet would likely be restricted to jobs in the sedentary to light physical demand level.[128]  Favorolo concluded that Ledet could find work as a small engine repair person, a shuttle driver, a transportation dispatcher, and a filament maker, each of which pay between $9

---

[124]   (*Id.*)

[125]   (*Id.* at 189.)

[126]   (*Id.* at 189, 192.)

[127]   (Trial Tr. (Day II, Morning) at 51.)

[128]   (*Id.* at 50.)

and $10 per hour.[129]  Favorolo testified that, although it is
unlikely, Ledet may be able to obtain a GED if he were to receive
assistance from an adult education program, and that doing so may
open up more vocational alternatives.[130]

Based on the testimony of the vocational experts and the
other evidence presented at trial, the Court finds that Ledet
will be able find full-time, minimum wage employment in the
future.  The Court notes that, while Dr. Ulm testified that Ledet
should "listen to his body" in increasing his activity level,[131]
Ulm did not indicate one way or another whether Ledet would be
unable to return to work.  Further, although Ledet has not
provided a functional evaluation to the Court, both Hegwood and
Favorolo opined that Ledet could work in the light to sedentary
range of occupations.  Further, the Court observes that Ledet was
able to sit through two days of trial, which involved being
seated for hours at a time.  For all of foregoing reasons, the
Court finds that Ledet could handle a full-time job, so long as
he were given the options to sit down and stand up from time to
time.  Even though Hegwood testified that installation of a pain

---

[129]   (*Id.* at 51-52.)

[130]   (*Id.* at 53, 59.)

[131]   (*Id.* at 26.)

pump would limit Ledet to working only three hours per day because of the problems associated with the device, the Court does not find it credible that Ledet will actually have a pain pump installed.  Installation of a pain pump is a highly invasive procedure, requiring a large incision in the patient's front abdominal wall and a smaller incision in the back.[132]  After the initial installation, the same procedure must be repeated every five to ten years for life to replace the pump.[133]  The patient must also have the pump refilled every three to six months.[134]  When Dr. Ulm suggested the pain pump as an option in July 2010, Ledet indicated that he did not want to pursue it.[135]  Ledet also indicated at trial that he did not want the pain pump because he is averse to the idea of being "cut on" further.[136]  Ledet testified that, "if" the pain pump were going to help him in the long run, "then that's what I need to do."[137]  Yet, he has taken

---

[132]   (Trial Tr. (Day II, Morning) at 22.)

[133]   (Trial Tr. (Day I, Afternoon) at 194; Trial Tr. (Day II, Morning) at 22.)

[134]   (Trial Tr. (Day I, Afternoon) at 194; Trial Tr. (Day II, Morning) at 22.)

[135]   (Trial Tr. (Day II, Morning) at 42.)

[136]   (*Id.* at 121.)

[137]   (*Id.*)

no steps to have a pain pump installed since Ulm suggested it as a possibility.[138]  Moreover, it is not clear that the pain pump is a viable treatment option for Ledet even if he intended to pursue it.  Ulm testified that, before a pain pump can be installed, Ledet would be required to have its efficacy tested against a placebo.[139]  Also, Hegwood testified that candidates for a pain pump must undergo a mandatory psychiatric evaluation before installation.  Because Ledet has undergone neither of these evaluations, and given the invasiveness of the procedure and Ledet's stated aversion to being "cut on," the Court finds it too speculative to conclude that Ledet will ultimately be treated with a pain pump.  Accordingly, the Court does not credit Hegwood's assessment that Ledet could not perform full-time work as a result of limitations associated with a pain pump.

The Court also declines to accept Hegwood's assessment that Ledet may not be able to find sedentary work because of his intellectual limitations.  At trial, Ledet was able to discuss complex concepts related to his work and injury, using vocabulary and technical terms in the proper context.  He was also able to work successfully as a deckhand until the time of his accident, a

---

[138]    (*Id.* at 42.)

[139]    (*Id.* at 23.)

job that requires the ability to follow directions and complete multi-step tasks.  While the Court credits Hegwood's and Favorolo's conclusion that Ledet is unlikely to obtain a GED, the Court has no trouble concluding that Ledet does not suffer from a mental handicap.  The Court therefore rejects Hegwood's opinion that Ledet will have difficulty securing sedentary work at minimum wage.

In finding that Ledet would be limited to minimum wage occupations, the Court also rejects Favorolo's testimony that Ledet could find work that pays between $9 and $10 per hour. Favorolo opined, for example, that Ledet could work as a shuttle driver.  Yet, this conclusion lacks credibility given the effects of Ledet's regimen of pain medication.  The Court also finds that, because of Ledet's medical condition, lack of academic achievement, and prior felony drug conviction, Ledet would not be competitive for the types of higher paying occupations that Favorolo identified.

Using an estimated worklife of 16.95 years and Ledet's pre-injury salary, Ledet's economist, Dr. Rice, estimates that the present value of Ledet's future, after-tax wage loss is $569,774. Rice further estimates that, if Ledet were to return to a minimum-wage job at 40 hours per week, his net future discounted

44

wage loss would be $373,863.[140]  That figure is largely consistent
with the projections provided by Smith Marine's economist, Dr.
Broudreaux.[141]  The Court credits Ledet's economist and awards
Ledet $373,863 for future lost wages.


**C.   Pain and Suffering**

Ledet has endured pain and suffering associated with his
back injury.  Ledet's back was broken as a result of the pendant
wire striking him and throwing him against the bulkhead of the
SMITH HUNTER.  Specifically, Ledet suffered a moderate
compression fracture of the superior endplate of L1 and a mild
compression fracture at T12.[142]  Although a four-level fusion has
provided some relief, Ledet continues to live with debilitating
pain.  He is unable to engage in the hobbies that he enjoyed
before the accident.  For instance, his back pain prevents him
from playing with his children and grandchild and playing with
his dog.[143]  Before the accident, Ledet was able to help his
mother around the house, for example, by cutting her grass,

---

[140]    (Tr. Ex. 19.2)

[141]    (Tr. Ex. 18.8.)

[142]    (Tr. Ex. 23.11.)

[143]    (Trial Tr. (Day II, Morning) at 122.)

changing the oil in her car, cooking, and cleaning.[144]  Ledet is
no longer able to do perform those activities.[145]  Ledet stated
that he currently takes Percocet for pain and is concerned that
he will eventually become addicted to pain medication.[146]  Ledet's
pain medication keeps him from driving,[147] and his pain restricts
him from sitting for extended periods.[148]  In addition, Ledet now
walks with a cane and hunches over to relieve his back pain.
Ledet's injury prevents him from continuing in the occupation of
an offshore deckhand, an occupation from which he gained
substantial satisfaction.  The accident has also deprived him of
his goal of becoming a tugboat captain,[149] and, according to
Hegwood, Ledet's experience on tugboats is not transferrable to
other types of vessels where the physical requirements would be
less demanding.[150]  Ledet is likely to suffer from serious pain
for the rest of his life.  For all these reasons, the Court finds
that Ledet is entitled to an award of $1,300,000 for mental and

---

[144]   (*Id.* at 113-14.)

[145]   (*Id.* at 114.)

[146]   (*Id.* at 117-18.)

[147]   (*Id.* at 119.)

[148]   (*Id.* at 119-20.)

[149]   (Trial Tr. (Day II, Morning) at 77.)

[150]   (Trial Tr. (Day I, Afternoon) at 198.)

46

physical pain and suffering.  Based on the testimony at trial, the Court apportions this amount as follows: $300,000 for past pain and suffering and $1,000,000 for future pain and suffering.

**D.   Past and Future Medical Expenses**

Ledet is entitled to medical expenses related to his back injury, which was caused by the October 17, 2009 accident.  As for past medical expenses, it is undisputed that Smith Marine has paid for Ledet's medical expenses in full up until this point. Accordingly, Ledet is not entitled to an award of past medical expenses.

As to future medical expenses, Dr. Ulm testified that, at this point, the most likely treatment for Ledet would be an implantable pain pump.[151]  As discussed above, however, the Court finds its too speculative that Ledet will, in fact, have the pain pump installed.  Dr. Ulm testified that, if Ledet does not receive the pain pump, Ledet's treatment will consist of chronic pain management through oral pain medication.  In awarding future medical expenses, the Court thus estimates the present value of the cost of Ledet's pain management over his lifetime.

A review of Ledet's medical records indicates that Ledet

---

[151]   (*Id.* at 21.)

sees a pain management specialist about every three weeks at a cost of $225 per visit.[152]  In addition, the record contains a history of Ledet's prescription payments from November through December 2009.[153]  Based on those records, the Court finds that Ledet's pain medications cost about $383 per month.[154]  These costs, taken together, give Ledet a yearly pain management cost of $8,496 (($225 / 3 * 52) + ($383 * 12)).

Ledet is now 41 years old.  According to the actuarial table provided by the Social Security Administration on its website, Ledet is expected to live another 36.69 years.  Using the discount rate of 2 percent provided by Dr. Rice,[155] the present value of Ledet's future medical expenses based on an annual payment of $8,496 is $219,379.30.[156]  Based on the evidence

---

[152]    (Tr. Exs. 31.68-31.74.)

[153]    (Tr. Ex. 27.54.)

[154]    The Court arrives at this figure by averaging Ledet's monthly payments for November 2009 and December 2009, excluding his payments for Chantix, a smoking cessation medication.  The Court includes Ledet's prescription for Zolpidem, a sleeping aid, as Ledet testified that his difficulty sleeping is related to his pain.  (Trial Tr. (Day II, Morning) at 108.)

[155]    (Tr. Ex. 19.1.)

[156]    The Court uses the following formula to calculate present value based on annual payments:  $PV = A(((1+i)^n - 1) / (i(1 + i)^n))$.  $A$ represents the annual payment; $i$ represents the discount rate; $n$ represents the number of years.

presented by the parties, the trial testimony, the nature of
Ledet's injuries, and Ledet's relatively young age, the Court
finds that $219,379.30 is a reasonable approximation of Ledet's
actual future medical expenses and awards that amount as part of
Ledet's damages.


**E.    Pre-Judgment Interest**

In admiralty, the court has the discretion to award
pre-judgment interest.  There is a strong presumption in favor of
awarding pre-judgment interest, and it will usually be denied
only in cases in which the plaintiff exercised undue delay in
bringing his action.  *U.S. v. Ocean Bulk Ships, Inc.*, 248 F.3d
331, 344 (5th Cir. 2001).  When a Jones Act case is tried to a
jury, the Court may not award pre-judgment interest, but when a
Jones Act case is tried to the Court, it may award pre-judgment
interest.  *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th
Cir. 1987); *Bush v. Diamond offshore Co.*, 46 F. Supp. 2d 515, 523
(E.D. La. 1999).  It is within the discretion of the Court to
select an equitable rate of pre-judgment interest.  *Hansen v.
Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).  The
Court finds no delay here and that the plaintiff is thus entitled
to receive pre-judgment interest at .26 percent, which is the
most recently quoted rate for one-year constant-maturity treasury

bills, from the date of judicial demand until the date of
payment.  Pre-judgment interest may be awarded only on damages
that have actually accrued as of the date of judgment.  *Martin v.
Walk, Haydel & Assocs., Inc.*, 794 F.2d 209, 212 (5th Cir. 1986).


**IV.  SUMMARY**

On the basis of the foregoing findings of fact and
conclusions of law, the Court finds that the plaintiff, Chad
Ledet, has sustained damages due to the negligence of Smith
Marine.  Accordingly, the plaintiff is entitled to recover from
the defendant the following damages:

|   |   |   |
|---|---|---|
| A. | Future Wage Loss: | $373,863.00 |
| B. | Past Pain and Suffering | $300,000.00 |
| C. | Future Pain and Suffering: | $1,000,000.00 |
| D. | Future Medical Expenses: | $219,379.30 |
| E. | Additional Maintenance | $1,486.09 |
| | Total Damages: | $1,894,728.39 |

Because Ledet was not found contributorily negligent, Smith
Marine will bear the entire cost of the judgment.  Ledet is
entitled to pre-judgment interest on past damages from the date
of judicial demand until the date paid, and he is entitled to
post-judgment interest on all remaining damages from the date of
judgment until the date paid.  Both pre- and post-judgment

interest is to be calculated at a .26 percent per annum rate.

New Orleans, Louisiana, this <u>4th</u> day of April, 2011.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE